NORTHERN PACIFIC RAILWAY CO., APPELLANT, *v.* SMITH, RESPONDENT.

(No. 4,562.)

(Submitted November 5, 1921. Decided December 24, 1921.)

[203 Pac. 503.]

*Ejectment—Northern Pacific Land Grant—Public Lands—Adverse Possession—Statute—Doctrine of Relation.*

Public Lands—Northern Pacific Land Grant—Identification of Land— Survey—Adverse Possession.
   1. *Held,* that while the grant to the Northern Pacific Railroad Company of every odd-numbered section of public land on each side of its

---

1. Right of one claiming title by adverse possession of public land in subordination to United States to assert such possession against another claimant, see notes in 20 **Ann. Cas.** 538; 76 **Am. St. Rep.** 480.

proposed railroad line (13 Stats. at Large, 365) was *in praesenti*, the grant did not attach to any section until it was segregated from the public domain and identified by the official survey approved by the land department, and that therefore entry upon an odd-numbered section before survey was insufficient to initiate a claim of adverse possession as against the railroad company.

Same—Title by Prescription—Inapplicability of Doctrine of Relation.

2.    Title by prescription to an odd-numbered section in the Northern Pacific land grant, initiated by adverse possession before identification of the section by the official survey, did not relate back to the date the intruder's occupancy began, thus cutting off the title granted by the statute, but commenced to run for the statutory period of ten years only from the date the official plat of the survey was approved.

Adverse Possession—When Statute Commences to Run.

3.    The statute of limitations relating to adverse possession of land will not run against the owner until he is in such a position that he can protect his title by an appropriate action, *i. e.*, he must have such a right that it can be invaded.

*Appeals from District Court, Prairie County; C. C. Hurley, Judge.*

ACTION by the Northern Pacific Railway Company against John Smith. From a judgment for defendant and an order denying a new trial, plaintiff appeals. Reversed and remanded.

*Messrs. Gunn, Rasch & Hall,* for Appellant, submitted a brief; *Mr. Carl Rasch* argued the cause orally.

(Authorities cited in brief are incorporated in the opinion and therefore are omitted here.)

*Mr. John C. Tope,* for Respondent, submitted a brief and one in reply to that of Appellant.

In the case of the *Northern Pacific R. R. Co.* v. *Majors,* 5 Mont. 111, 2 Pac. 322, the court held that "that court [United States supreme court] has repeatedly held, in construing grants of land made by Congress, that 'a grant' of lands 'may be made by law as well as by a patent issued pursuant to a law,' and such grant vests in indefeasible and irrevocable title." (*Fletcher* v. *Beck,* 6 Cranch, 87, 3 L. Ed. 162; *Strothers* v. *Lucas,* 12 Pet. 454, 9 L. Ed. 1154; *Tarrett* v. *Taylor,* 9 Cranch,

43, 3 L. Ed. 650; *Wilkinson* v. *Leland,* 2 Pet. 627, 7 L. Ed. 542; 3 Washburn on Real Property, 4th ed., 193, 194.) The court further held that "a confirmation of title by the Act of Congress was a higher evidence of title than a patent, as it was a direct grant of the fee which had been in the United States, by the government itself, whereas a patent was only the act of its ministerial officers." (*Grignon's Lessee* v. *Astor,* 2 How. 319, 11 L. Ed. 283.) The court further holds "that a grant of lands by the government is tantamount to a convey-ance with livery of seizin" (3 Washburn on Real Property, 4th ed., 191). "He who takes title to lands from the federal government draws the actual legal possession to it." (*Robinson* v. *Lake,* 14 Iowa, 421.) The court says further: "It is agreed that the route of the railroad, for the consideration of which a grant was made, was to be designated and until such desig-nation, the title did not attach to any specific tracts of land. When the route was fixed their location became certain and the title which was previously imperfect, acquired precision and became attached to the land." "When the location was made, and the sections granted ascertained, the title of the plaintiff took effect by relation as of the date of the Act, except as to the reservations mentioned, the act of having the same operation upon the sections as if they had been specifically de-scribed therein." The court held that patent from the United States merely confirmed the right and title of the railroad com-pany but did not convey any title to the lands. The court says that inasmuch as the company has good power to sell the lands designated before the issue of a patent, that is itself an interpretation by Congress of its intention to bestow a present grant contained in section 3.

In the case of the *United States* v. *Northern Pac. R. R. Co.,* 6 Mont. 351, 12 Pac. 769, the court held "that a grant is a legis-lative reservation and takes effect whenever the route of the road is fixed." (*Buttz* v. *Northern Pacific R. R. Co.,* 119 U. S. 55, 30 L. Ed. 330, 7 Sup. Ct. Rep. 100.) The court

says that no matter whether the land was surveyed or not the company held an absolute title in all odd-numbered sections.

Upon the authority of the *Northern Pacific R. R. Co.* v. *Majors,* 5 Mont. 111, 2 Pac. 322, *Northern Pacific R. R. Co.* v. *Lilly,* 6 Mont. 65, 9 Pac. 116, and *United States* v. *Williams,* 6 Mont. 379, 12 Pac. 851, the court in the case of *United States* v. *Goodwin,* 7 Mont. 402, 16 Pac. 850, held that "land contained within the grant from the United States to the Northern Pacific Railroad Company is not public lands of the United States." If the granted lands were not public lands, undoubtedly they were private lands of the company. (See, also, *Southern Pac. R. R. Co.* v. *Whitaker,* 109 Cal. 268, 41 Pac. 1083; *Curtner* v. *United States,* 149 U. S. 675, 37 L. Ed. 890, 13 Sup. Ct. Rep. 985, 1041, and cases cited; *Forrester* v. *Scott,* 92 Cal. 398, 28 Pac. 575; *Jatunn* v. *Smith,* 95 Cal. 154, 30 Pac. 200.)

The case of *Toltec Ranch Co.* v. *Babcock,* 24 Utah, 183, 66 Pac. 876, is a case in which the defendant entered upon the land after the railroad had filed its survey of definite location of its line and before patent had issued to the company. The court held "that the railroad take title on the filing of the survey of location and that the statute of limitations begin to run from that time and not from the date of the patent." These cases conclusively determine the proposition that title to the granted lands in question passed from the general government to its grantee at the time the grantee fixed and determined its route and that the grantee's title did not date from the issuance of the patent. These cases further determine the proposition that no matter whether the granted lands were surveyed or not the legal title thereto passed from the government to the grantee upon the fixing of the general route of the railroad and not upon the issuance of patent, and that the legal title being in the railroad company from the date of the fixing of its route adverse possession would run against the railroad the same as against any other person holding the legal title.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Action in ejectment. After the issues were made up, the cause was submitted to the court without a jury upon an agreed statement of facts, the substance of which is the following:

Section 15, township 14 north of range 46 east of the Montana principal meridian in Prairie county, Montana, the land described in the complaint, is an odd-numbered section within the limits of the primary grant of land made to the Northern Pacific Railroad Company, the predecessor in interest of the plaintiff, by the Act of Congress of June 2, 1864. Patent for the section was issued by the United States to the plaintiff on June 10, 1913. The government survey in the field of the township and section was made in May, 1909, and the official plat of the survey was approved by the United States surveyor-general of Montana on January 12, 1912. The plat was approved by the commissioner of the general land office of the United States on August 14, 1912, and was filed in the United States land office at Miles City, Montana, the office of the district within which the section is situated, on November 15, 1912. At the time of the commencement of this action, in July, 1917, the defendant had been in the possession of the section for more than ten years, a sufficient time to acquire title by prescription if his possession could operate as adverse possession against the plaintiff prior to the survey and identification of the section by the approval of the official plat of the survey in 1912. The court decided in favor of the defendant, holding that he had "acquired title to the land in question by adverse possession and had absolute title thereto as against the plaintiff." Plaintiff moved for a new trial. The motion was denied. The cause is before this court upon appeals from the judgment and the order denying the motion.

By section 3 of the Act of July 2, 1864 (13 Stats. at Large, p. 365), the Congress granted to the Northern Pacific Railroad Company, its successors and assigns, in aid of the construction

of its railroad, "every alternate section of public land, not mineral, designated by odd numbers to the extent of twenty (20) alternate sections per mile on each side of said railroad line as said company may adopt," and by section 6 made it the duty of the President of the United States to cause "the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad."

As disclosed by his written opinion, which we find incorpo-
[1]  rated in the record, the district judge adopted the view announced by the courts generally, which have considered grants by the federal government in aid of railroads similar to the one made to the Northern Pacific Railroad Company, that they were grants *in praesenti*, but that they were floats, and did not attach to any part of the public domain until the routes selected by the several grantees were definitely located.    He held further that, after the route of the plaintiff road was definitely located, and while any of the lands within its boundaries remained unsurveyed, an intruder entering upon any unsurveyed portion thereof which was thereafter shown by an authorized survey to be the property of the plaintiff could not, by his occupancy, acquire title to it by adverse possession.    He also held, however, that, though this is so, when the land so occupied is surveyed, the plaintiff's title reverts to the date of the grant, and the title of the adverse holder or occupant runs from the date at which his tenure began.    Accordingly, he concluded that the defendant had acquired title to the land in question by adverse possession.    The determinative question presented in this case, then, is whether the statute of the state of Montana providing for the acquisition of the title to land by adverse possession became operative before the segregation of the particular tracts or sections granted from the public domain and their identification by the approval of the government survey.    It is apparent that the land in question was not

segregated from the public domain and identified as an odd-numbered section, subject to the terms of the grant, until the approval of the official plat in 1912. In fact, there was no section 15, the one involved herein, until the survey had been completed and approved.

The operation of the grant was considered by the territorial supreme court of Montana in several cases, namely: *Northern Pacific R. R. Co.* v. *Majors,* 5 Mont. 111, 2 Pac. 322, *Northern Pacific R. R. Co.* v. *Lilly,* 6 Mont. 65, 9 Pac. 116, and *United States* v. *Godwin,* 7 Mont. 402, 16 Pac. 850. While in all of these cases it was held that the grant of Congress was *in praesenti,* in none of them was it held that the definite location of the route was in itself sufficient to give title to the railroad company to any particular portion of the lands included therein, until the survey required by section 6 of the Act had been completed and approved. In the first of these cases, after examining a great number of decisions by the supreme court of the United States, the court said: "These decisions also determine for us (where the Act itself does not indicate the particular lands granted, but leaves their location to be specified in the future) when such a grant shall attach to the particular tracts, and become fixed and certain, until which it is a float, which in this case would be when the line of the road is definitely fixed, and the lands granted thereto ascertained. This is necessary to be done to give precision to the grant and attach it to the particular tracts of 'land. When such line is definitely fixed, and the sections of land designated by the survey, the grant then becomes certain, and, by relation, has the same effect upon the lands thus designated as if they were specifically described therein. Therefore we must conclude, now having in view simply sections 3 and 6 of the Act in question, that the grant takes effect as of date of the Act, and becomes attached to the specific tracts when definitely ascertained by the location of the route of the road and the survey of the lands."

It was said by the supreme court of the United States in *Maguire* v. *Tyler*, 8 Wall. 650, 19 L. Ed. 320: "Where the documentary evidences of title produced by the claimant contain no sufficient lines or boundaries to show that any definite and distinct parcel of land was severed from the public domain, the universal rule as settled by repeated decisions of this court is that the concession in such a case creates no right of private property in any particular tract of land which can be maintained in a court of justice without an antecedent survey and location. * * * Several cases determine that, where there is a specific tract of land confirmed according to ascertained boundaries, the legal effect of the confirmation is to establish the right and locate the claim, but where the claim has no certain limits, and the decree of confirmation carries along with it the condition that the land must be surveyed, and severed from the public domain and the concessions of other parties, then it is beyond controversy that the title of the claimant, although confirmed, attaches to no land, nor has a court of justice any authority in law to ascertain and establish the boundaries, as that power is reserved either to the executive department or to Congress."

So in the case of *Middleton* v. *Low*, 30 Cal. 596, the supreme court of California in considering the question of a selection of lands in lieu of the sixteenth and thirty-sixth sections granted to the state for school purposes prior to the survey by the United States of the lands selected, held that the right of selection by the state could not be exercised until after survey had been made by the United States, and that a selection previous to such survey could not vest the title in the state or a purchaser from the state. The court said: "The reasons operating to prevent the state or her vendee from acquiring a title by the aid of a selection made, as in that case [referring to *Grogan* v. *Knight*, 27 Cal. 515], before the congressional survey, are equally cogent to show that title to any particular parcel of the lands granted for the purposes of public schools does not vest in the state until such survey has been made.

There is, in fact, no such tract of land as that described in the petition until it has been located within the congressional township, by an actual survey and establishment of the lines, under the authority of the United States, and the survey has been approved by the proper United States Surveyor-General. A person may approximate to the lines that may be run—may surmise the precise lines—but the tract has no separate legal identity until the survey is made and approved under the authority of Congress." (See, also, *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241, 35 L. Ed. 999, 12 Sup. Ct. Rep. 158, and *Leavenworth R. R. Co.* v. *United States,* 92 U. S. 733, 23 L. Ed. 634.)

This court recognized the same rule in the case of *Clemmons* v. *Gillette,* 33 Mont. 321, 114 Am. St. Rep. 814, 83 Pac. 879. It held that, though the grant of school lands to the state of Montana operated for some purposes as a grant *in praesenti* conveying the fee, yet, until the official survey had been made, and the plat approved by the federal authorities, the grant was not effective to vest in the state title to any specific portion of the land described by the designation of section numbers only.

In the case of *United States* v. *Birdseye,* 137 Fed. 516, 70 C. C. A. 100, the circuit court of appeals, in considering the question whether a particular odd-numbered section, two lines of which had been surveyed, was sufficiently identified to vest title in the railway company and its grantee so that the latter could lawfully cut timber thereon, held: "The partial survey by the United States of a section of public land by running lines on two sides of it is insufficient to identify it as an odd-numbered section, within the grant to the Northern Pacific Railroad Company, so as to relieve one cutting timber thereon from liability to the United States." Again, in *Carroll* v. *United States,* 154 Fed. 425, 83 C. C. A. 245, the defendant attempted to justify the inclosure of unsurveyed lands within the Northern Pacific Railroad grant by producing a deed of conveyance of a part of the land involved from the railway company, but the court rejected the evidence, holding: "On

a trial of a defendant charged with maintaining an unlawful inclosure of public lands, a deed from a railroad company to defendant for unsurveyed public lands, described by section and subdivision as though surveyed, is inadmissible to show color of title, since it creates no right to any particular land.''

These authorities conclusively determine the proposition that the title to particular tracts or sections of the lands granted does not pass from the general government to the grantee until they have been surveyed and identified. Until this has been done the federal government retains a proprietary interest in them, to the extent that it will exercise the same dominion over them as over its ungranted lands. (*United States* v. *Montana Lumber Mfg. Co.,* 196 U. S. 573, 49 L. Ed. 604, 25 Sup. Ct. Rep. 367.)

It is true that the cases of *Middleton* v. *Low* and *Clemmons* v. *Gillette, supra,* involved the title to lands granted to the state by Congress in aid of the common schools, yet the grants were grants *in praesenti,* the same in general character as the grants in aid of railroads.

Upon this branch of the case we agree with the learned [2] district judge, but disagree with him entirely in his conclusion that, when the survey has been made, the title of the adverse occupant relates to the date when his occupancy began and cuts off the title granted under the statute. This doctrine was announced by the supreme court of Missouri in the case of *Gibson* v. *Chouteau,* 39 Mo. 588, but upon error to the supreme court of the United States (13 Wall. 92, 20 L. Ed. 534) it was distinctly repudiated. Of it the court said: ''The error of the learned court consisted in overlooking the fact that the doctrine of relation is a fiction of law adopted by the courts solely for the purposes of justice, and is only applied for the security and protection of persons who stand in some privity with the party that initiated proceedings for the land, and acquired the equitable claim or right to the title. [Citing cases.] The defendants in this case were strangers to that party and to his equitable claim, or equitable title, as it is

termed, not connecting themselves with it by any valid transfer from the original or any subsequent holder. The statute of limitations of Missouri did not operate to convey that claim or equitable title to them. It only extinguished the right to maintain the action of ejectment founded thereon, under the practice of the state. It left the right of entry upon the legal title subsequently acquired by. the patent wholly unaffected." To the same effect is the case of *Redfield* v. *Parks,* 132 U. S. 239, 33 L. Ed. 327, 10 Sup. Ct. Rep. 83.

In considering this subject the supreme court of Iowa, in *Grant* v. *Iowa Land Co.,* 54 Iowa, 673, 7 N. W. 113, stated its conclusion as follows: "Plaintiff insists that the title acquired by the grantee relates back to the grant, and therefore he will be regarded as the owner of the land from the date of the grant itself. Upon this position an argument is based supporting the claim that the lands were taxable before they were identified under the grant. It is undoubtedly true that for certain purposes defendants' title may be said to begin with the grant, and when the grant is applied to its subject it may be said that the title existed from the day the grant was made. But the grantee in fact had no title to the specific lands until the grant was applied thereto. Until the lands were identified the grant was a float, as it is called by the United States supreme court. * * * This doctrine of relation is a fiction intended to subserve the ends of justice in protecting the rights of the claimant of property; it cannot be invoked to defeat rights, or create a liability." The same conclusion was announced by this court in the case of *Tyler* v. *Tyler,* 50 Mont. 65, 144 Pac. 1090. The following cases are also in point: *Lynch* v. *De Bernal,* 9 Wall. 315, 19 L. Ed. 714; *Schlosser* v. *Hemphill,* 118 Iowa, 452, 90 N. W. 842; *State* v. *Lake St. Clair Fishing & Shooting Club,* 127 Mich. 580, 87. N. W. 117. All of them furnish support also for the conclusion stated above as to the necessity for the survey of lands granted before the statute of limitations begins to run in favor of an alleged adverse occupant. It is well settled that the statute will not run [3] against the owner of land until he is in such a position

that he can protect his title by an appropriate action. In other words, he must have such a right that it can be invaded, and the necessity is thus cast upon him to protect it. When this necessity arises, and then only, the statute begins to run. Title by adverse use can be initiated only by the invasion of a right which the owner may assert by an appropriate action, and becomes perfected only by his failure to assert it for the full statutory period. (*Bullerdick* v. *Hermsmeyer*, 32 Mont. 541, 81 Pac. 334.) The plaintiff in this case never had such a right in the property involved until the survey was made. In other words, it was laboring under such a disability that it could not, as owner, maintain an appropriate action to protect its title because it could not identify any of the lands until they were surveyed. It is a familiar principle that the statute does not begin to run until the disability of the owner is removed.

The judgment and order are reversed, and the district court is directed to render judgment in favor of plaintiff.

*Reversed and remanded.*

ASSOCIATE JUSTICES REYNOLDS, COOPER, HOLLOWAY and GALEN concur.